**U.S. BANKRUPTCY COURT**
**District of South Carolina**

Case Number:  **24-02253-eg**

# ORDER DENYING CONFIRMATION OF CHAPTER 13 PLAN

The relief set forth on the following pages, for a total of 15 pages including this page, is hereby ORDERED.

**FILED BY THE COURT**
**11/15/2024**



Elisabetta G. M. Gasparini
US Bankruptcy Judge
District of South Carolina

Entered: 11/15/2024

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

IN RE:

C/A No. 24-02253-EG

Henry L Brown, III,

Chapter 13

Debtor(s).

**ORDER DENYING CONFIRMATION**
**OF CHAPTER 13 PLAN**

**THIS MATTER** is before the Court on the Objection to Confirmation ("Objection") filed by Navy Federal Credit Union ("Creditor").[1]  The Court held a contested confirmation hearing on November 5, 2024, which was attended by Henry L. Brown, III ("Debtor"), Debtor's Counsel, Creditor's Counsel, and the Chapter 13 Trustee.  Creditor, the holder of a junior mortgage lien on Debtor's residence at 329 Tufton Court, Cayce, South Carolina (the "Property"), opposes confirmation of Debtor's Chapter 13 Plan because the plan proposes to strip its lien from the Property in violation of 11 U.S.C. § 1322(b)(2).  Debtor, on the other hand, argues that Creditor's lien may be stripped from the Property because its interest is wholly unsecured.  The parties agree that the issue for determination by the Court is whether the value of the Property exceeds the amount due on the first mortgage—$369,346.86.

Debtor testified regarding his opinion of the value of the real property and its condition. The Court also heard testimony from the parties' two real estate appraisers, whose opinions of the Property's value varied widely.  The parties presented several exhibits into evidence, including recent appraisal reports prepared by the real estate appraisers, a 2023 appraisal of the Property, a 2023 loan application signed by Debtor, the Lexington County property tax record for the Property, and copies of the proofs of claim filed by Creditor and the holder of the first mortgage.[2]  At the

---

[1] ECF No. 16, filed Aug.16, 2024.
[2] The parties stipulated to the admissibility of the exhibits.

conclusion of the hearing, the Court took the matter under advisement.  After a thorough review

of the record, the evidence presented, and the parties' pleadings, and weighing the burden of proof

which ultimately rests with Debtor, the Court finds that the fair market value of the Property

exceeds $369,346.86.    Accordingly, confirmation of Debtor's plan is denied based on the

following findings of fact and conclusions of law:

## FINDINGS OF FACT

Debtor filed a voluntary petition under chapter 13 of the Bankruptcy Code on June 24,

2024 (the "Petition Date").  On July 23, 2024, Debtor filed his schedules and statements.[3]  On

Schedule A/B: *Property*, Debtor disclosed ownership of the Property and indicated that its value

is $360,000.00.   Debtor testified that he purchased the Property in 2021 for $320,000.00 and

refinanced the debt in August of 2023 with loans from NewRez LLC ("NewRez") and Creditor.

Attached to the Schedules is a copy of the Lexington County tax record as of July 11, 2024, which

indicates that the Property has a value of $320,000.00 and 3,375 square feet of living area.[4]  On

Schedule D: *Creditors Who Have Claims Secured by Property*, Debtor listed Creditor as the holder

of a wholly unsecured second mortgage on the Property in the amount of $44,791.60, and NewRez

as the holder of the first mortgage on the Property in the amount of $367,496.30, partially

unsecured in the amount of $7,496.30.  No other liens on the Property are reflected in Debtor's

schedules.

On July 23, 2024, Debtor also filed his Chapter 13 Plan (the "Plan").[5]  In Part 3.2 of the

Plan, Debtor seeks to value Creditor's lien at $0.00 pursuant to 11 U.S.C. § 506 based upon the

lack of equity in the Property beyond the first mortgage.  The Plan proposes no payments to

---

[3] ECF Nos. 11 & 12.
[4] Debtor's Ex. A.
[5] ECF No. 13.

Creditor beyond those received as a general unsecured creditor pursuant to Part 5.1 of the Plan.

Through the Plan, Debtor further proposes to pay the Chapter 13 trustee $199.00 per month for 60

months—a total of $11,940.00—and to maintain monthly contractual payments to NewRez.[6]

Creditor objects to its treatment under the Plan.

Creditor filed a proof of claim on July 9, 2024,[7] asserting a fully secured claim of

$44,791.60 with interest at the rate of 11.66%.  Creditor indicated in its claim that the value of the

Property is $404,297.00.  On September 3, 2024, NewRez LLC d/b/a Shellpoint Mortgage

Servicing filed a proof of claim, asserting a secured claim of $369,346.86, secured by the

Property.[8]  Although no value of the Property is indicated on the proof of claim, NewRez stated

that its claim is fully secured.  NewRez's proof of claim attaches copies of a note and mortgage

which were executed on August 25, 2023.  Debtor has not objected to either NewRez's or

Creditor's proofs of claim.

At the confirmation hearing, Debtor testified that in his opinion, the Property has a current

value of $360,000.00.  He testified that while the Property was in good condition when he

purchased it in 2021 and had increased in value by the time he refinanced in 2023, it has since

declined in value due to significant damage caused by his dog and a water leak.  According to

Debtor, Creditor contacted him in 2023 to offer him a home equity line of credit secured by the

Property.  As its exhibits show, Creditor sought and obtained an appraisal of the Property, prepared

by Corey Morell ("Morell") of Windmill Appraisal Services on August 1, 2023 (the "Origination

Appraisal"),[9] in connection with the origination of Debtor's second mortgage loan.  Morell

---

[6] NewRez's proof of claim indicates that Debtor owes a total arrearage of $3,767.58 on its mortgage loan.  POC No.
18-1; Debtor's Ex. C.  The Plan does not provide for payment of the arrearage; however, NewRez did not raise an
objection to its treatment under the Plan.
[7] POC No. 3-1; Creditor's Ex. 1.
[8] POC No. 18-1.
[9] Creditor's Ex. 3.  A copy of Morell's Real Estate Appraisers License is attached to the Origination Appraisal.
Morell did not appear as a witness during the hearing.

determined in the Origination Appraisal that the value of the Property was $391,000.00 as of July

31, 2023, and stated that the Property had a gross living area of 3,752 square feet.  To determine

the Property's value, Morell used comparable sales from within the same neighborhood, which

had gross living areas ranging from 2,642 sq. ft. to 4,168 sq. ft.

During cross-examination, Creditor's Counsel referred Debtor to the Uniform Residential

Loan Application (the "Loan Application"),[10] dated August 25, 2023, that he had filled out and

signed to obtain the second mortgage loan from Creditor in the principal amount of $45,342.00.

In the Loan Application, Debtor indicated that the Property had a value of $391,000.00, consistent

with the Origination Appraisal.  When asked why he thought the value in 2023 was higher than

when he purchased the Property, thus giving him enough equity to secure a second mortgage, he

testified that he had estimated the increase in value based upon what he observed other houses

were selling for in his neighborhood at that time.  Debtor was unable to provide any specific

information suggesting that property values in his neighborhood have decreased since the

origination of the loan with Creditor other than a general observation that he has seen a lot of "for

rent" signs instead of "for sale" signs.

Debtor presented an appraisal report prepared by Michael Struck ("Struck") on October

14, 2024.[11]  Regarding his qualifications, Struck testified that he has been a certified real estate

appraiser for more than 20 years and has performed residential real estate appraisals in South

Carolina for 10 years.  He has previously testified in bankruptcy court regarding valuation matters.

To reach his opinion that the Property's value was $358,000.00, Struck conducted a physical

examination of the exterior of the Property, performed an interior assessment by Zoom, and

reviewed comparable sales within the neighborhood.  Struck applied the sales comparison

---

[10] Creditor's Ex. 4.
[11] Debtor's Ex. D.

4

approach to determine value and rejected the cost and income approaches as irrelevant or

unnecessary.  He did not measure the square footage of the residence—relying instead upon the

county tax assessor's records, which reflect that the residence has 3,375 square feet of living area.

As none of the comparable sales in the neighborhood were the same square footage as the Property,

Struck adjusted the values of the comparable sales he used to accommodate for the differences in

size.  In his opinion, the neighborhood was "cookie cutter" and the properties all had the same

builder, same quality of construction, and were all under the same homeowner's association

("HOA").  Struck did not specify the methodology he used to adjust the values of the comparable

sales in the neighborhood; rather, he testified that it was in line with industry standards.  Struck's

appraisal report referenced a general text addendum for sales adjustments, but he admitted it had

been inadvertently omitted from the report.  His appraisal report indicated that the market in area

was stable with growing inventory.  Struck used three comparable sales—two of which were in

the same condition and one that was in better condition:

|  | Debtor's Property | Comparable #1 | Comparable #2 | Comparable #3 |
|---|---|---|---|---|
| Sale Price | N/A | $335,000 | $340,000 | $357,500 |
| Adjusted Sale Price | N/A | $355,500 | $365,000 | $358,900 |
| Price per square foot | N/A | $134.43 | $141.20 | $113.06 |
| Gross living area (square feet) | 3,375 sq. ft. | 2,492 sq. ft. | 2,408 sq. ft. | 3,162 sq. ft |
| Number of Bedrooms & Bathrooms | 4 bed, 3 bath | 4 bed, 2.1 bath | 3 bed, 2.1 bath | 4 bed, 3 bath |
| Distance from Residence | N/A | 0.20 miles N | 0.17 miles NW | 0.08 miles NW |
| Condition | C3 (good) | C2 (like new) | C3 (good) | C3 (good) |
| Date of sale | N/A | 06/2024 | 11/2023 | 08/2023 |
| Age (yrs.) | 10 | 8 | 8 | 8 |

Based upon his examination of the Property and review of comparable sales, Struck concluded

that the Property had a value of $358,000.00 as of October 14, 2024.  On cross-examination, Struck

admitted that his estimate of the value of the Property would increase if the Property's square footage was in fact 3,735 instead of 3,375.

Creditor presented an appraisal prepared by John Wright ("Wright") on October 4, 2024.[12] Wright testified that he has been a certified General Real Estate Appraiser in South Carolina since 1993 and has also previously testified in bankruptcy court. Wright opined that the Property's value was $475,000.00. According to his testimony, Wright conducted an onsite interior and exterior examination of the Property and measured its internal square footage—ultimately determining that the Property had a gross living area of 3,735 sq. ft.—a difference of 360 sq. feet from the square footage used by Struck. Wright had reviewed the Creditor's Origination Appraisal from 2023 and noted that the appraiser had determined the Property's gross living area was 3,752 square feet and estimated that the property had a market value of $391,000 as of July 31, 2023. Wright testified that his market data research did not indicate an overall drop of property values in this market in the past year; rather, his appraisal report indicates that the real estate market in the general area around the Property was stable but notes a shortage of supply of available housing.

Like Debtor's appraiser, Wright applied the sales comparison approach to determine value; however, unlike Struck, he used comparable sales outside of the Property's neighborhood because, as he testified at the confirmation hearing, he was unable to find recent sales of similarly sized properties in the neighborhood. The distance of all three comparable sales Wright used was over 7 miles from the Property, but the square footage of living area for each was closer in size to the Property than Struck's comparables:

---

[12] Creditor's Ex. 2.

|  | Debtor's Property | Comparable #1 | Comparable #2 | Comparable #3 |
|---|---|---|---|---|
| Sale Price | N/A | $495,000 | $540,000 | $420,000 |
| Adjusted Sale Price | N/A | $477,435 | $476,065 | $460,810 |
| Price per square foot | N/A | $136.97 | $131.71 | $134.66 |
| Gross living area (square feet) | 3,375 sq. ft. | 3,614 sq. ft. | 4,100 sq. ft. | 3,119 sq. ft |
| Number of Bedrooms & Bathrooms | 4 bed, 3 bath | 5 bed, 4.5 bath | 5 bed, 3.5 bath | 4 bed, 2.5 bath |
| Distance from Residence | N/A | 12.36 miles W | 7.15 miles SW | 7.45 miles SW |
| Condition | Good | Good | Good | Good |
| Date of sale | N/A | 10/2023 | 04/2024 | 05/2024 |
| Age (yrs.) | 10 | 5 | 7 | 9 |

Wright testified that the comparable sales he used were from competing areas with similar amenities and properties of similar quality and condition. He further testified that he used the Solomon Adjustment Calculator to determine the adjustment amounts for the comparable sales, a method which he indicated was generally accepted by Government-Sponsored Enterprises (GSE) such as Fannie Mae and Freddie Mac, which have specific requirements for appraisal methodology to ensure that adjustments are reliable and supported by data. Wright's application of the Solomon Adjustment Calculator indicated that for properties in this area that are selling in the $130-$140 per square foot range, an $85.00 per square foot adjustment rate was appropriate to equalize the properties being compared. He testified that it is not reliable to use vastly different sized properties as comparable sales. Wright testified that Struck appeared to have used a different adjustment method. The numbers reflected in Struck's report reflect that he made adjustments of approximately $30.00 per square foot.[13]

---

[13] When the Court asked for clarification regarding the adjustments during closing arguments, Struck was unavailable to aid counsel in answering the Court's questions because he had left the hearing without asking for permission to be excused.

**DISCUSSION AND CONCLUSIONS OF LAW**

Chapter 13 of the Bankruptcy Code permits a debtor, in some instances, to bifurcate a creditor's claim and provide different treatments under the debtor's chapter 13 plan for the secured portion of its claim and the unsecured portion of its claim. *In re Keels,* 661 B.R. 929 (Bankr. D. Md. 2024). Under § 506, a debtor may modify a creditor's secured claim by limiting the secured portion of its claim to the value of the collateral securing the claim and treating the remainder of its claim as an allowed unsecured claim. 11 U.S.C. § 506(a). A debtor's ability to modify a secured claim in a Chapter 13 case, however, is limited under 11 U.S.C. § 1322 where the claim is secured solely by an interest in the debtor's principal residence. Section 1322 provides that a Chapter 13 plan may "modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence*, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims." 11 U.S.C. § 1322(b)(2) (emphasis added). In general, a debtor may not bifurcate a mortgage creditor's claim and strip off the unsecured portion of the creditor's lien unless the mortgage creditor's claim is wholly unsecured. *In re Davis,* 716 F.3d. 331, 335 (4th Cir. 2013). A completely valueless lien may be classified as an unsecured claim under § 506(a) and may be removed from the property pursuant to §§ 1322 and 1325 of the Bankruptcy Code. *Id.*; *see also Keels,* 661 B.R. at 935; *In re Strever,* 468 B.R. 776, 780 (Bankr. D.S.C. 2012) ("When a principal residence serves as the underlying collateral, a second mortgage may be stripped off if the total amount of all superior liens exceeds the value of the property after its value is established under § 506(a)(1)."); *In re Lamb,* 24-01434-5, 2024 WL 4553293, at *13 (Bankr. E.D.N.C. Oct. 22, 2024) ("[C]hapter 13 debtors may strip wholly unsecured liens where there is no value to support the lien.").

8

Creditor's status as secured or unsecured depends on the value of the Property.  *Davis,* 716

F.3d at 335.  Creditor does not dispute that its lien is second in priority to the mortgage lien held

by NewRez, which is valued at $369,346.86 according to its proof of claim.  If the value of the

Property exceeds $369,346.86, then Creditor's claim would be partially secured, and its lien could

not be stripped.  "The ultimate burden of proof regarding a motion to value a secured claim and

the confirmation of a chapter 13 plan is on the debtor by the preponderance of the evidence."  *In*

*re Gillis,* No. 24-01835-EG, 2024 WL 4434551, at *5 (Bankr. D.S.C. Oct. 4, 2024) (quoting *In re*

*Lloyd,* No. 18-02936-jw, 2018 WL 6984813, at *7 (Bankr. D.S.C. Nov. 19, 2018)); *see also In re*

*Johnston,* No. 12-51263, Adv. No. 12-05066, 2013 WL 1844751 (Bankr. W.D. Va. Apr. 12, 2013)

(finding that a chapter 13 debtor bears the burden to prove he is entitled to prevail in an action to

strip a lien from a debtor's primary residence); *Lamb,* 2024 WL 4553293, at *5 (concluding that

the burden of proof for valuation should be allocated to the debtor).  Accordingly, Debtor bears

the burden of demonstrating by a preponderance of evidence that the value of the Property is less

than the value of the senior lien.  *See Johnston,* 2013 WL 1844751 at *6.  As evidence of value,

the Court has been presented with competing appraisal reports, Debtor's testimony regarding his

opinion of the Property's value, and the Lexington County tax assessment.

Debtor's appraiser, Struck, determined that the Property has a value of $358,000.00 as of

October 14, 2024.  On the other hand, Creditor's appraiser, Wright, determined that the Property

had a value of $475,000.00 as of October 4, 2024—an increase of $117,000.00 from Debtor's

appraiser's valuation.  Courts have disagreed regarding the proper date for valuation of collateral.

*In re Keels*, 661 B.R. at 933.  While some courts use the petition date for valuing property in the

residential lien stripping context, there is prior authority in this district indicating that the date of

the valuation hearing may be the proper date.  *See In re Coates*, 180 B.R. 110, 120 (Bankr. D.S.C.

1995) (finding that collateral securing a creditor's claim should be valued as of the date of the hearing on the motion for relief from stay). However, since both parties have presented evidence of the value as of October 2024, the Court finds it is unnecessary to determine the proper date as it does not affect the outcome in this matter.

Although both appraisers possessed the necessary qualifications and experience to provide a reliable estimate of value, the Court has concerns regarding both appraisals. Notably, Struck did not measure the Property and concluded that the gross living area was 3,375 square feet using the county tax assessor's records. Wright measured the Property and determined that the gross living area was 3,735 square feet. The 2023 appraisal prepared for Creditor in connection with the origination of its loan similarly reflects that the Property has a gross living area of more than 3,700 square feet and has a value of $391,000.00. While the 2023 appraisal is not the most relevant evidence of value in this matter given its date, the testimony at the confirmation hearing indicated that overall market values for residential real estate had not declined in that area over the past year.

While both appraisers used the comparable sales approach to determine value, the Court also has concerns with the reliability of the comparable sales used and the disparity in adjustments made by the appraisers. For example, Struck used comparable sales from within the Property's neighborhood for properties that were smaller in size, making adjustments of approximately $30.00 per square foot for the difference in gross living area, while Wright used comparable sales more than 7 miles from the Property which were more similarly sized, but made adjustments of $85.00 per square foot according to the Solomon Adjustment Calculator to accommodate for the differences in gross living area. Though he acknowledged that location is a key consideration for buyers, Wright testified that the comparable sales he used were selected because they were similarly in HOA communities and were of similar size and condition. However, the Court is not

convinced that Wright's comparable sales were the most reliable, as they were outside the

neighborhood, more than 7 miles from the Property, and in different municipalities.  The Court is

also not convinced that Struck's adjustment value of approximately $30.00 per square foot is more

reliable than Wright's adjustment value of $85.00 per square foot.

When questioned by the Court regarding the adjustment calculations, Wright explained

that the Solomon Adjustment Calculator was a preferred method to make adjustments for

differences in size of comparable sales and that it appeared Struck had used a different method.

Struck testified that his adjustments were made based on "industry standards," but he was not

available to explain the specific adjustment calculation method he had used.  The Court notes that

if the $85.00 per square foot adjustment rate used by Wright is applied to Struck's comparable

sales, their adjusted values would increase to $404,055.00, $411,055.00, and $370,605.00,

respectively.  If the Property's gross living area is adjusted to 3,735 square feet, as Wright's

measurements indicate, those adjusted values would further increase to $434,655.00, 448,795.00,

and $401,205.00.  Even without taking the adjustments into consideration, the price per square

foot of Struck's comparables were $134.43, $141.20, and $113.06, respectively.  Averaged

together, the sales price per square foot would be $129.56.  This amount multiplied with the square

footage of the Property used in his appraisal--3,375 sq. ft. of living area—equals $437,276.00.

Struck also admitted, when pressed, that the Property's value would increase above $358,000.00

if its gross living area was in fact 3,735 square feet as per Wright's measurement.  Consideration

of these values supports a finding that the value of the Property exceeds $369,346.86.  Because

Struck did not measure or conduct an interior, in-person examination of the Property, the Court

finds that Wright's determination that the Property has 3,735 square feet of gross living area is

more reliable.

The Lexington County tax assessment indicates that the Property has an assessed value of $320,000.00 and has 3,375 square feet of living area.  Wright testified that the tax assessor's calculations of living area square footage are not reliable because the tax assessor does not enter the Property to measure the interior, and his measurements of the Property indicated that the living area was 300 square feet larger than the tax assessor's estimate.  Struck did not measure the interior of the Property, and Debtor did not present evidence disputing Wright's calculations.  Based upon the testimony presented by Debtor, Struck, and Wright, the Court finds that the Lexington County tax assessment presents less persuasive evidence of the current market value of the Property in this case due to the size discrepancy.  *See In re Hayes,* 657 B.R. 519, 529 (Bankr. D.S.C. 2024) (declining to place significant weight on the county tax assessment in determining value of collateral).

According to Debtor, the Property has a current market value of $360,000.00.   Debtor offered no convincing explanation for the Property's apparent decline in value of more than $30,000 since he represented that the Property was worth $391,000.00 on his loan application to Creditor in August of 2023.  He testified that the Property has decreased in value since he applied for the loan last year because there has been damage to the outside of the house from his dog, there are cracks in the foundation, and there is some water damage to the roof and interior.  However, he later indicated that those issues had been repaired using the funds from the loan refinance with Creditor as well as insurance proceeds.  Debtor offered no further evidence in support of his testimony that the Property was in poor condition, and none of the appraisals presented indicate that the Property is in poor condition.  His opinion that the Property had declined in value was not supported by other evidence.  Both Wright and Struck indicated that the property values in the area were stable.  In fact, Debtor's appraiser, Struck, testified that the values in the area had remained

12

stable since September of 2022.  *See In re Johnston,* 2013 WL 1844751, at *3 (concluding that the

debtor's valuation was not an adequately reliable estimate of value when compared with the

valuations provided by the appraisers).

Debtor argued that under *In re Smith,* when the Court is presented with conflicting

appraisals, the Debtor's opinion is the best indication of value.  632 B.R. 297, 299 (Bankr. D.S.C.

2021).  In *Smith,* the Court determined the value of the property based solely upon the testimony

of the debtor and her non-filing spouse, as well as the county tax assessment.  *Id.*  No competing

appraisals were submitted for consideration by the Court because the creditor was unable to obtain

an appraisal prior to the hearing.  *Id.*  The Court concluded that the value of the property was

established despite the limited evidence, finding that "[t]he law is clear that an owner is competent

to give her opinion of the value of her own property, as provided by the Federal Rule of Evidence

701" and noting that the tax assessment had been admitted without objection and supported the

debtor's opinion of value.  *Id*.  Unlike Debtor in this case, the debtor in *Smith* presented

photographs of the property into evidence to show its poor condition and the existing damage to

the property.  The Court disagrees with the Debtor that *Smith* holds that a debtor's opinion of value

is better evidence of value than competing appraisals.  *Smith* simply holds that a debtor's opinion

of value may be considered as admissible evidence of value.  It does not conclude that the debtor's

opinion of value carries more weight than the opinion of a qualified real estate appraiser when

such evidence is offered.  The Court in *Smith* further stated in a footnote that "County tax appraisals

may not significantly contribute to the weight given the owner's opinion (as opposed to market

appraisals or personal knowledge of comparable sales).  Here, the absence of other evidence and

the extensive testimony on the condition of the [p]roperty contribute to supply sufficient weight to

the opinion."  *Id.* at 299 n.4.  This indicates that market appraisals would likely be provided with

more weight than the owner's opinion of value. *See also Johnston,* 2013 WL 1844751, at *3 (considering debtor's opinion but ultimately finding it unreliable when compared with the valuations provided by the appraisers).

In this case, Debtor's testimony was not supported by other evidence such as photographs showing damage to the Property. The photographs included with the appraisals of the Property did not reflect significant damage to the Property as indicated by Debtor. The Court has considered Debtor's testimony as admissible evidence of the value of the Property but finds his opinion should be given less weight under the circumstances of this case than the opinions of value provided by the real estate appraisers. While neither recent appraisal presented provided a convincing conclusion of value, when considering the totality of the evidence presented, the Court finds that Debtor has failed to meet his burden of establishing that the value of the Property is not more than $369,346.00 and that Creditor's claim is wholly unsecured. *See Keels,* 661 B.R. at 933 (stating that if any portion of the creditor's claim is supported by the value of the Property, the debtor may not modify it under the Chapter 13 plan). Therefore, Debtor's proposed modification of Creditor's claim is prohibited by 11 U.S.C. § 1322(b)(2).

IT IS, THEREFORE, ORDERED that Creditor's objection to confirmation is sustained and confirmation is denied. Debtor shall have ten (10) days from the entry of this Order within which to propose, file, and serve a modified plan pursuant to SC LBR 3015-2. If Debtor fails to comply with the terms of this Order, the case may be dismissed without further notice or hearing.

**AND IT IS SO ORDERED**.